UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DEAUNDRA PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00113-JRS-MJD |
| | ) | |
| WEXFORD HEALTH CARE SERVICES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Deaundra Patterson alleges in this lawsuit that medical staff at Wabash Valley Correctional Facility (Wabash Valley) denied him treatment for restrictive lung disease and asthma,[1] gastroesophageal reflux disease (GERD), and a particle in his eye.[2] He further contends that these failures resulted from a policy, practice, or custom on the part of Wexford of Indiana, LLC (Wexford), the company contracted to provide medical care to inmates of the Indiana Department of Correction (IDOC). The defendants have moved for summary judgment.[3] For the reasons below, the motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

---

[1] The parties treat Mr. Patterson's claims based on restrictive lung disease and asthma as separate claims and dispute whether Mr. Patterson suffers from restrictive lung disease at all. At bottom, however, Mr. Patterson's claims are understood as claims that he had trouble breathing and consistently experienced (regular severe sounds like an oxymoron) severe asthma attacks and the defendants failed to treat him properly. The Court will therefore treat these claims as related.

[2] Mr. Patterson also discusses his dermatofibroma condition in his response to the motion for summary judgment. But any claim based on this condition was not identified in the Court's screening order. Dkt. 10 at 2-3. Further, Mr. Patterson was given the opportunity to point out claims that were not identified by the Court and filed a motion to identify claims, noting only his claim based on his asthma. *See* dkt. 13, 28.

[3] Mr. Patterson filed a surreply to the motion for summary judgment. But the surreply was filed a month after the defendants filed their reply in support of the motion for summary judgment and the defendants' reply does not contain new evidence or objections to the plaintiff's evidence. The surreply therefore does not comply with Local Rule 56-1(d) and has not been considered.

# I.
## Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

Dr. Samuel Byrd and Dr. Naveen Rajoli both worked at Wabash Valley during the time of Mr. Patterson's allegations. Dkt. 70-2 ¶ 1-2 (Byrd Affidavit); dkt. 70-3 ¶ 1-2 (Rajoli Affidavit).

Dr. Michael Mitcheff worked for Wexford as the Regional Medical Director (RMD). Dkt. 70-4 ¶ 2 (Mitcheff Affidavit). Dr. Mitcheff's duties included review and consideration of formulary exception requests (FERs) submitted by on-site physicians. *Id.* ¶ 5. The IDOC maintained a formulary medication list, which was a list of medications that doctors could independently prescribe, without having to request approval. *Id.* If a medication was not on the formulary, prescribers were required to submit a FER. *Id.* Dr. Mitcheff would review and either approve the request or recommend an alternative treatment plan (ATP), which would typically include a recommendation for a similar medication that was on the IDOC's formulary or the preferred non-formulary medication. *Id*.

Lesa Wolfe and Tara Powers worked as licensed practical nurses (LPN) at Wabash Valley. Dkt. 70-5 ¶ 2 (Wolfe Affidavit); dkt. 70-9 ¶ 2 (Powers Affidavit). Theresa Bradley (formerly Auler) worked as a Registered Nurse (RN). Dkt. 70-6 ¶ 2 (Bradley Affidavit). Kim Hobson was the Health Services Administrator. As the HSA, she was rarely involved in direct patient care; instead she oversaw the provision of medical services and responded to grievances, among other administrative functions.  Dkt. 70-10 (HSA Job Description).  Cora Roberts and Briana Batchelor worked as Certified Nursing Assistants (CNAs). Dkt. 70-7 ¶ 2 (Roberts Affidavit); dkt. 70-8 ¶ 2

(Batchelor Affidavit). These defendants did not have the authority to diagnose patients, order specific medical treatment, override a physician's orders, or prescribe medication. Dkt. 70-5 ¶ 9; dkt. 70-9 ¶ 7; dkt. 70-6 ¶ 11; Dkt. 70-7 ¶ 6; dkt. 70-8 ¶ 6. Nurse Wolfe was the pharmacy nurse and rarely, if ever, provided direct patient care. Dkt. 70-5 ¶ 6-7.

### B. Mr. Patterson's Medical Treatment

Mr. Patterson has experienced chronic asthma and GERD for many years. *See* dkt. 82 at 24. He was treated by Dr. Lewton for a particle in his eye and a lump on his eyelid and was prescribed eyedrops. Dkt. 2-1 at 45. The claims in this case are based on treatment Mr. Patterson received between September of 2020 and July 1, 2021. Dkt. 10.

#### 1. Fall of 2020

Mr. Patterson received a Xopenex inhaler for his asthma on August 19, 2020. Dkt. 70-1 at 66. Because Mr. Patterson's asthma was classified as "moderate," he was eligible for one inhaler every 3-4 months. Dkt. 70-2 ¶ 5. Xopenex inhalers are rescue inhalers, meant to be used only when a patient is experiencing acute asthma symptoms. *Id.* The order for Mr. Patterson's Xopenex inhaler instructed him to take 2 puffs every 6 hours as needed. Dkt. 70-1 at 66. He was not meant to take 2 puffs every six hours if he was not experiencing symptoms such as coughing, chest tightness, wheezing, and shortness of breath. Dkt. 70-2 ¶ 5.

Mr. Patterson received Carafate[4] on August 3, 2020, August 27, September 25. Dkt. 70-1 at 48-49. He received only an 8-day supply on September 25 because he did not have any refills available. Dkt. 70-2 ¶ 7. Nurse Wolfe explains that this should have lasted him until October 9, 2020. Dkt. 70-5 ¶ 10.

---

[4] Carafate, whose generic name is Sucrafate, is an antacid. Cleveland Clinic, *Sucralfate Tablets*, https://my.clevelandclinic.org/health/drugs/20284-sucralfate-tablets (last visited Mar. 1, 2024).

Mr. Patterson submitted a Health Care Request Form (HCRF) on September 20, 2020, requesting refills of his Xopenex inhaler and Carafate. Dkt. 70-1 at 68. Nurse Wolfe responded that she sent refill requests for the medications that were available to be refilled. Dkt. 70-5 ¶ 10. If a medication was not due for a refill, Nurse Wolfe would not send the request because it would be rejected. *Id.* Since he was not due for an inhaler, a refill was not available. Dkt. 70-5 ¶ 10. According to his medical records, Mr. Patterson received the Carafate on September 25. Dkt. 70-1 at 66.

Mr. Patterson submitted another HCRF on September 28, 2020, again requesting refills of his Carafate and Xopenex inhaler. Dkt. 70-1 at 67. This HCRF stated:

> On 9-20-20 I requested my Clindamycin, Xopenex Inhaler, Carafate, and aspirin meds. On 9-20-20 I received a 8-14 day supply of Carafate and Clindamycin. I was told I did not receive my 30-day supply due to having no refills and I need to see the Doctor to renew my prescription. Please schedule me to see the Doctor to renew prescriptions. I have never received my Xopenex inhaler or aspirin. Please prescribe medications. Please refill my artificial tears, refill due on 9-2-20.

*Id.* In response, Nurse Wolfe informed Mr. Patterson that his Carafate and Clindamycin had been refilled on September 22, 2020. *Id.* Nurse Wolfe did not address the inhaler because Mr. Patterson received his last inhaler on August 19 and did not have an available refill. Dkt. 70-5 ¶ 11.

Mr. Patterson asserts that on October 7 and 8, 2020, he informed Nurse Powers that he had been experiencing severe asthma attacks and that she told him she would retrieve a rescue inhaler from the pharmacy. Dkt. 70-9 ¶ 5. Nurse Powers does not recall these encounters but testifies that she would not have told Mr. Patterson that she would retrieve an inhaler from the pharmacy because she is not allowed to order medical treatment or prescribe medication. *Id.* ¶ 6-7.

Mr. Patterson saw Dr. Byrd for a chronic care visit on October 8, 2020. Dkt. 70-1 at 43-47. During this visit, they discussed Mr. Patterson's asthma and GERD. *Id.* Mr. Patterson reported using the inhaler once per day, on average, and slightly more in winter. *Id.* Mr. Patterson states

that he told Dr. Byrd that he was having frequent and severe asthma attacks and difficulty breathing because he did not have an inhaler. Dkt. 82 ¶ 17. He further asserts that Dr. Byrd told him that "they changed [his] inhaler dispensary to one inhaler every 4 months due to inhalers costing too much and other offenders were found to have abused their inhalers." *Id.* Dr. Byrd discussed with Mr. Patterson the possibility of adding Singulair as a maintenance medication, which Mr. Patterson declined. Dkt. 70-1 at 43-47. Dr. Byrd suggested that Mr. Patterson take a pulmonary function test because of how much he was using his inhaler. *Id.* Dr. Byrd talked to Mr. Patterson about proper inhaler use and mailed him a handout about using the Xopenex inhaler. *Id.* As for Mr. Patterson's GERD, he reported that it was getting worse. *Id.* Dr. Byrd suggested a trial of Prilosec,[5] but Mr. Patterson declined because of the potential side effects. *Id.* He remained on Carafate. *Id.* Mr. Patterson received 120 tablets of Carafate on October 12, 2020. *Id.* at 28. This should have lasted him through November 11. Dkt. 70-2 ¶ 9.

Mr. Patterson was seen on October 14, 2020, by Nurse Lauren Cupp, for GERD symptoms. Dkt. 70-1 at 13-15. Nurse Cupp suspected that Mr. Patterson was dehydrated, with an electrolyte deficiency. *Id.* She educated him on proper nutrition and hydration and advised him to return to nursing sick call if his symptoms did not subside or worsened. *Id.*

Mr. Patterson submitted an HCRF on November 2, 2020, asking for refills of his Carafate and Xopenex inhaler. Dkt. 70-1 at 38. Nurse Bradley responded the next day, informing him that she had requested refills of both. *Id.* Mr. Patterson had received 120 tablets of Carafate on October 12, 2020, so he should not have run out of that medication until November 11, 2020, at the earliest. Dkt. 70-2 ¶ 9.

---

[5] Prilosec, also known as Omeprazole, is a proton pump inhibitor that decreases the amount of acid produced in the stomach. *Prilosec*, https://www.drugs.com/prilosec.html (last visited Feb. 29, 2024).

Mr. Patterson underwent a pulmonary function test on November 12, 2020. Dkt. 70-1 at 29-30; dkt. 70-2 ¶ 12. The test revealed a potential restrictive lung pattern, which is not uncommon in asthma patients. Dkt. 70-2 ¶ 12. While Mr. Patterson contends that he was diagnosed with restrictive lung disease, Dr. Byrd explains that he did not diagnose restrictive lung disease but did note the restrictive lung pattern. *Id.*

Mr. Patterson was seen in nursing on November 20, 2020, for his heartburn. Dkt. 70-1 at 9-12. Dr. Byrd was contacted and ordered Prilosec for 56 days. *Id.* Mr. Patterson also submitted a HCRF that day requesting a refill of his Xopenex inhaler. Dkt. 70-1 at 41. Nurse Bradley's response states: "Mr. Patterson - Refills on Xopenex inhalers are every 3-4 months. One has been ordered today, as you have been having issues. There is no documentation that you have been seen for any urgent medical needs for your asthma." *Id.* Mr. Patterson submitted another HCRF on a week later, requesting, among other things, a refill of his Xopenex inhaler. Dkt. 70-1 at 40. Nurse Bradley's response did not address the inhaler, as it had just been addressed. *Id.*; dkt. 70-6 ¶ 7.

Mr. Patterson submitted a HCRF on December 17, 2020, asking to see the doctor and requesting a new inhaler. Dkt. 2-1 at 22. Nurse Bradley responded, informing Mr. Patterson that this was a rescue inhaler, only available to be refilled every 3-4 months, and that if he was having issues, he should be seen by a provider. *Id.* Nevertheless, since he was close to his refill date, Nurse Bradley asked the pharmacy to submit the refill for his Xopenex inhaler. Dkt. 70-6 ¶ 8. Mr. Patterson received an inhaler about a week later. Dkt. 70-1 at 20-27; dkt. 70-6 ¶ 8.

In an HCRF submitted on December 19, 2020, requesting, among other things, refills of his Prilosec and Carafate. Dkt. 70-1 at 39. Nurse Bradley responded, informing Mr. Patterson that these medications had been refilled. *Id.* Mr. Patterson received a refill of 120 Carafate tablets on December 26, 2020. *Id.* at 21. He also received 30 capsules of Prilosec on November 26, 2020,

which, if taken appropriately, would last him through December 26, 2020. Dkt. 70-1 at 23; dkt. 70-2 ¶ 15.

Mr. Patterson submitted a HCRF on December 29, 2020, requesting, among other things, refill of his Tobrex and artificial tears, which he claimed were due to be refilled on December 23, 2020. Dkt. 70-1 at 69. Nurse Wolfe responded on December 31, 2020, informing Mr. Patterson that he did not have an active prescription for Tobrex, but that she had sent the refill request for the artificial tears to the off-site pharmacy. *Id.*; dkt. 70-5 ¶ 12.

### 2. Early 2021

According to his medical records, Mr. Patterson received 120 Carafate tablets on December 26, 2020, which, if taken appropriately, would last him through January 25, 2021. Dkt. 70-1 at 19; dkt. 70-2 ¶ 16. He received a refill on January 23, 2021. *Id.*

Mr. Patterson submitted a HCRF on January 21, 2021, requesting, among other things, refills of his Xopenex inhaler and artificial tears. Dkt. 70-1 at 35. He claimed the refill for the artificial tears was due on January 22, 2021. *Id.* Nurse Wolfe sent for a refill of the artificial tears, but did not address the inhaler issue, because Mr. Patterson did not have a refill available. *Id.*; dkt. 70-5 ¶ 13. Mr. Patterson submitted another HCRF about a week later, requesting a refill of his Xopenex inhaler, and reporting that it did not even last him two months. Dkt. 70-1 at 34. He also stated that he had been requesting an evaluation for his asthma. *Id.* Nurse Wolfe responded, stating that his asthma was classified as "moderate persistent," for which 1 inhaler was allotted every 3-4 months. *Id.* Nurse Wolfe further informed Mr. Patterson that his last inhaler was received in December 2020, making the earliest he could receive a new one March 2021. *Id.* This was not a decision made by Nurse Wolfe, but by treating providers. *Id.*; dkt. 70-5 ¶ 14.

Dr. Byrd saw Mr. Patterson again for a chronic care visit two days after he submitted his HCRF. Dkt. 70-1 at 5-8. They discussed Mr. Patterson's asthma and GERD. *Id.* Mr. Patterson noted he was using his rescue inhaler 4 times per day and was displeased with only receiving an inhaler every 3-4 months. *Id.* Dr. Byrd advised Mr. Patterson that his asthma was classified as moderate, which typically requires only a rescue inhaler that lasts 3-4 months. *Id.* Mr. Patterson's asthma was also classified as persistent, but this was solely based on his reported inhaler use. *Id.* Mr. Patterson stated his desire to be on a maintenance medication. *Id.* Dr. Byrd and Mr. Patterson had discussed the possibility of him taking Singulair in the past, since his asthma appeared to be allergy-related, but Mr. Patterson had declined. *Id.* At this appointment, Mr. Patterson agreed to try Singulair, so Dr. Byrd submitted a FER, as Singulair was not on the IDOC's formulary. *Id.* Dr. Byrd also counseled Mr. Patterson on appropriate inhaler use. *Id*. Mr. Patterson also reported that his GERD was getting worse, and that he wished to receive Pepcid, or Prilosec, if Pepcid was not available. *Id.* Dr. Byrd counseled Mr. Patterson on the need to avoid spicy foods and NSAIDs, decrease his caffeine intake, and increase his water intake. *Id.* Mr. Patterson reported he was already doing all of these things. *Id.*

On February 4, 2021, Dr. Byrd ordered a chest x-ray, which was normal. Dr. Mitcheff states that this contradicts Mr. Patterson's claims that he suffered frequent, severe asthma attacks and that his asthma was persistent and required such frequent rescue inhaler use. Dkt. 70-1 at 4; dkt. 70-4 ¶ 6. Dr. Mitcheff states that if Mr. Patterson were experiencing severe asthma, the x-ray would likely reflect flattening of the diaphragm from hyperinflation, bronchial thickening, or collapse of part of the lung. *Id.* Dr. Byrd also submitted a FER for Singulair. Dkt. 70-1 at 17-18. Dr. Mitcheff denied the request because Mr. Patterson did not appear to have an airway obstruction. *Id.*; dkt. 70-4 ¶ 7.

Mr. Patterson submitted a HCRF on February 15, 2021, requesting, among other things, refills of his Xopenex inhaler, Prilosec, and Carafate. Dkt. 70-1 at 33. Nurse Bradley responded informing Mr. Patterson that he was not due for a refill of his Xopenex inhaler until February 23, 2021. *Id*. Based on Mr. Patterson's medical records, this appears to have been incorrect, as he was prescribed 1 inhaler every 3-4 months, and his last inhaler was received on December 23, 2020, making the earliest he could receive a new inhaler March 23, 2021. Dkt. 70-6 ¶ 10.  Regardless, a refill was not available on February 16, 2021. *Id*. Nurse Bradley also informed Mr. Patterson that he did not have active orders for Prilosec or Carafate. Dkt. 70-1 at 33.

Mr. Patterson submitted a HCRF on February 23, 2021, requesting among other things, refills of his Xopenex inhaler, which he claimed was due on February 23, 2021, and his Carafate, which he claimed was due on February 10, 2021. Dkt. 70-1 at 32. That request stated: "I feel a burning, simmering pain in my stomach under my breastbone. My GERD symptoms have returned for the worse since my Prilosec order was used. The pain gnaws at me and wakes me up at night, lasting for hours. I have been vomiting up blood and bile due to the stomach acid. I feel symptoms of a stomach ulcer and need to be evaluated by the doctor." *Id.* Nurse Wolfe responded, informing him that he was not due for a refill of his Xopenex inhaler, as his prescription was for 1 inhaler every 3-4 months, and he had just received a new inhaler on December 19, 2020. *Id.* She also informed him that she was waiting for his new Pepcid prescription to be filled. *Id.* Because Mr. Patterson had expressed his desire to take Pepcid during his January 29 chronic care visit with Dr. Byrd, Dr. Byrd had discontinued his Carafate prescription, and entered an order for Pepcid, which Mr. Patterson received on February 28, 2021. Dkt. 70-2 ¶ 19; dkt. 70-1 at 65. Mr. Patterson had received his last refill of Carafate on January 23, 2021, which should have lasted him through February 22, 2021. *Id.*

Dr. Byrd saw Mr. Patterson to follow-up on his asthma on February 24, 2021. Dkt. 70-1 at 1-3. Dr. Byrd discussed with Mr. Patterson that the FER for Singulair had not been approved, since his spirometry results showed only moderate restriction, as opposed to an airway obstruction, which Dr. Byrd believed was related to Mr. Patterson's asthma. *Id.* Dr. Byrd told Mr. Patterson that the typical initial treatment for restriction would be inhaled corticosteroids and that he would request an 80 mcg Alvesco inhaler, one puff twice per day. *Id.*

On March 3, 2021, Dr. Byrd submitted a FER for Mr. Patterson to receive an Alvesco inhaler. Dkt. 70-1 at 16. Dr. Mitcheff recommended an ATP, advising that because Mr. Patterson did not appear to have an airway obstruction, and that Singulair could be tried, if Dr. Byrd believed there was a significant allergic component to Mr. Patterson's asthma. *Id.* Dr. Mitcheff responded: "Sam, We have to stop all this convenience stuff! When your patients transfer, I get complaints. Also, we have made many products Non formulary because of the WBVF factor. The latest is Carafate. I am going to take it off formulary." Dkt. 82 at 130.

Dr. Rajoli received an email in March of 2021 related to a FER that Dr. Byrd had submitted. *See* dkt. 82 at 141-42. Dr. Rajoli asked the sender if she had intended to send the email to Dr. Byrd instead. *Id.* Dr. Rajoli was not Mr. Patterson's treating provider at the time and had not submitted the FER. Dkt. 70-3 ¶ 5. Therefore, Dr. Rajoli did not believe he was the intended recipient of the email. *Id.*

### 3. Spring of 2021

Mr. Patterson submitted a HCRF on March 18, 2021, requesting, among other things, refills of his Xopenex inhaler, which he claimed was due on February 23, 2021, and his Pepcid, which he claimed was due on March 19, 2021. Dkt. 70-1 at 31. Nurse Wolfe responded "sent for," which meant she would send refill requests for the medications that were available to be refilled. *Id.*

According to his medical records, Mr. Patterson received 60 Pepcid tablets on February 28, 2021. *Id.* at 65. If Mr. Patterson was taking his medication appropriately, this should have lasted him through March 30, 2021. Dkt. 70-5 ¶ 16. Mr. Patterson received a Pepcid refill on March 24, 2021. Dkt. 70-1 at 65.

Dr. Rajoli saw Mr. Patterson for a chronic care visit on March 25, 2021. *Id*. at 54-57. They discussed Mr. Patterson's asthma, which, at that time, was classified as mild intermittent. *Id.* Dr. Rajoli noted that the severity level was minimal. At this time, Mr. Patterson was still receiving 1 inhaler every 3-4 months. Dr. Rajoli renewed the Xopenex inhaler prescription on this date but did not ask the pharmacy to immediately fill it. Dkt. 70-3 ¶ 6. Dr. Rajoli testifies that the inhaler could not be immediately refilled as Mr. Patterson received one on April 29, 2021, thus was not eligible for a refill for another 2-3 months. Dkt. 70-3 ¶ 6. This timeline is unclear however. If Mr. Patterson saw Dr. Rajoli on March 25, 2021, he could not have already received an inhaler a month later. It appears from the medical records that Mr. Patterson had most recently received an inhaler in December of 2020. Dkt. 70-1 at 20. They also discussed Mr. Patterson's GERD, which had a severity level of mild-moderate. Dkt. 70-1 at 54-57. Mr. Patterson had an active prescription for Pepcid, which Dr. Rajoli saw no reason to change. *Id.*

Mr. Patterson submitted an HCRF on April 10, 2021, requesting a Xopenex inhaler, and claiming that he should have received it weeks earlier. Dkt. 70-1 at 61. Nurse Wolfe responded, informing Mr. Patterson that because his asthma was classified as mild persistent, he was only eligible for 1 inhaler every 3-4 months. *Id.* Nurse Wolfe further informed Mr. Patterson that, per Dr. Rajoli, he was just now eligible for a refill. *Id.* Mr. Patterson received a Xopenex inhaler on April 29, 2021. *Id.* at 62.

Mr. Patterson submitted a HCRF on May 28, 2021, requesting a refill of his Xopenex inhaler. Dkt. 70-7 ¶ 7; dkt. 2-1 at 28. CNA Roberts responded on June 1, 2021, informing Mr. Patterson that he did not have a refill available. *Id.* Mr. Patterson's medical records indicate most recent refill was on April 29, 2021. Dkt. 70-1 at 62.

On June 15, 2021, Dr. Byrd submitted a FER for Mr. Patterson to receive Singulair. Dkt. 70-1 at 58. Dr. Mitcheff approved this request. *Id.* Mr. Patterson received 30 tablets—a one-month supply—on June 18, 2021. *Id.* at 59.

On June 21, 2021, HSA Hobson responded to Mr. Patterson's grievance in which he complained of a delay in receiving Singulair for his asthma. Dkt. 70-11 (Grievance Records). By the time he had submitted the grievance, Mr. Patterson had received the medication in question, so there was no further relief HSA Hobson could offer him. *Id.*

Dr. Mitcheff testifies that cost-saving was never prioritized over patient care. In fact, Singulair is a very inexpensive medication. Dkt. 70-4 ¶ 11. He states that his denial of the first two FERs was not in any way related to the cost of prescribing the medications, but rather the clinical indication for doing so. *Id.* Based on Dr. Mitcheff's review of the information provided to him with the first two FERs, he did not believe the medications were clinically indicated. *Id.* Dr. Mitcheff has seen no clinical evidence that Mr. Patterson has moderate persistent asthma, restrictive lung disease, or any airway obstruction. *Id.* It is Dr. Mitcheff's understanding that the classification of Plaintiff's asthma as "moderate persistent" was based solely on his reported use of the Xopenex inhaler. *Id.*

### III.
### Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to

incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The defendants do not contest for purposes of the summary judgment motion that Mr. Patterson's conditions were objectively serious.[6] To avoid summary judgment, then, the record must allow a reasonable jury to conclude that the defendants acted with deliberate indifference— that is, that they "consciously disregarded a serious risk to Mr. Patterson's health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Patterson "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not

---

[6] The defendants do argue that Mr. Patterson does not suffer from restrictive lung disease, but for the purpose of summary judgment, the Court considers Mr. Patterson's claim to be that he suffered from serious breathing issues that the defendants failed to treat.

based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

**A. Dr. Byrd**

Mr. Patterson contends that Dr. Byrd was deliberately indifferent to his GERD and asthma and lung disease.

### 1. GERD

The undisputed evidence reflects that when Dr. Byrd treated Mr. Patterson for his GERD complaints, Dr. Byrd considered this condition and discussed medication options with Mr. Patterson. Dkt. 70-1 at 43-47 (offered Prilosec, but Mr. Patterson declined). When Mr. Patterson asked to change medications, Dr. Byrd did so. *Id.* at 9-12 (ordering Prilosec based on Mr. Patterson's request in nursing sick call); 5-8 (ordering Pepcid). While Mr. Patterson argues that Dr. Byrd caused or was aware of delays Mr. Patterson experienced in receiving his medication, there is no evidence that Dr. Byrd received the HCRFs himself or otherwise was aware of any delays Mr. Patterson experienced in receiving his medication. No reasonable jury could conclude that Dr. Byrd was aware of any serious risk to Mr. Patterson as it related to his GERD and disregarded it. Accordingly, Dr. Byrd is entitled to summary judgment on Mr. Patterson's claim that he was deliberately indifferent to Mr. Patterson's need for GERD treatment.

### 2. Asthma and Lung Disease

Dr. Byrd argues that his evaluation and treatment for Mr. Patterson's asthma was appropriate and within his medical judgment while Mr. Patterson contends that he suffers from restrictive lung disease and that Dr. Byrd denied Mr. Patterson inhalers when he needed them and continued in less efficacious treatment.

The parties disagree on several facts on which this claim is based. For example, Mr. Patterson states that each time he saw Dr. Byrd in the clinic, he told Dr. Byrd that he was having frequent and severe asthma attacks and that he would run out of his rescue inhaler long before it was up for a refill. Dkt. 82 ¶ 17. Dr. Byrd testifies, however, that Mr. Patterson told him at his October 2020 appointment that he uses his inhaler about once per day and slightly more in the winter and later told him in January of 2021 that he was using his inhaler 4 times a day. Dkt. 70-2 ¶ 8. Mr. Patterson also testifies that he believed that he should use his inhaler 4 times a day, while Dr. Byrd testifies that he told Mr. Patterson that he should use it only on an as needed basis. Dkt. 82 ¶ 16; dkt. 70-1 at 43-47.

Construing the facts in the light most favorable to Mr. Patterson, a reasonable jury could conclude that Dr. Byrd was deliberately indifferent to Mr. Patterson's breathing issues. If a reasonable jury believed that Mr. Patterson told Dr. Byrd that he was having frequent and severe asthma attacks, that jury might also conclude that Dr. Byrd did not take enough action to treat the attacks. While Dr. Byrd offered Mr. Patterson testing and alternative medications, *see* Dkt. 70-1 at 43-47 (Dr. Byrd suggested a spirometry test and offered Singulair, which Mr. Patterson declined), Mr. Patterson experienced considerable delay in receiving any alternative medications. Notably, after Dr. Byrd saw Mr. Patterson in February of 2021, he submitted a request for an Alvesco inhaler. Dkt. 70-1 at 1-3. This time, Dr. Mitcheff denied the request for Alvesco but stated

that Singulair could be used for Mr. Patterson's asthma. The email regarding this request was apparently forwarded to Dr. Byrd on March 5, 2021, dkt. 82 at 141, but Singulair was not ordered until June of 2021. Dkt. 70-1 at 58-59. There is no explanation for this 3-month delay in ordering this medication. A reasonable jury considering these facts in the light most favorable to Mr. Patterson therefore could conclude that Dr. Byrd was deliberately indifferent to Mr. Patterson's need for treatment.

**B. Dr. Rajoli**

Mr. Patterson contends that Dr. Rajoli was deliberately indifferent to Mr. Patterson's GERD and breathing issues.

Dr. Rajoli saw Mr. Patterson only once during the relevant time, on March 25, 2021. Dkt. 70-1 at 54-57. Mr. Patterson had an active prescription for Pepcid to treat his GERD, which Dr. Rajoli saw no reason to change. *Id.* There is no evidence from which a reasonable jury could conclude that, by evaluating Mr. Patterson for his GERD at one visit and determining that his Pepcid prescription did not need changing, Dr. Rajoli disregarded Mr. Patterson's need for GERD treatment. Dr. Rajoli is therefore entitled to summary judgment on Mr. Patterson's claim that Dr. Rajoli was deliberately indifferent to Mr. Patterson's GERD.

Dr. Rajoli and Mr. Patterson also discussed his asthma. Mr. Patterson was still receiving 1 inhaler every 3-4 months. Dr. Rajoli testified that he renewed the prescription for his Xopenex inhaler but did not ask the pharmacy to immediately fill it, as Mr. Patterson had just received one on April 29, 2021, and was not eligible for a refill for another 2-3 months. Dkt. 70-3 ¶ 6. Obviously, this was incorrect. April 29 was a month in the future, and it appears from the medical records that Mr. Patterson had most recently received an inhaler in December of 2020. Dkt. 70-1 at 20. A reasonable jury believing that Mr. Patterson had last received his inhaler in December of 2020 and

that Dr. Rajoli did not immediately renew Mr. Patterson's prescription at the end of March might conclude that Dr. Rajoli was aware that Mr. Patterson had a serious need for asthma treatment that Dr. Rajoli disregarded. Perhaps this reflects a mistake rather than deliberate indifference by Dr. Rajoli, but the Court must view the evidence in the light most favorable to Mr. Patterson and resolve factual disputes in his favor at this stage. Dr. Rajoli is therefore not entitled to summary judgment on Mr. Patterson's asthma claim.

### C. Dr. Mitcheff

Mr. Patterson alleges in his complaint that Dr. Mitcheff was deliberately indifferent to Mr. Patterson's GERD and asthma. But the only evidence before the Court relates to Dr. Mitcheff's consideration of requests for additional medication for Mr. Patterson's asthma. There is therefore no evidence that Dr. Mitcheff was deliberately indifferent to Mr. Patterson's GERD and Dr. Mitcheff is entitled to summary judgment on this claim.

Dr. Byrd submitted a FER for Singulair in February 2021 because Mr. Patterson stated he was using his rescue inhaler 4 times per day. Dkt. 70-1 at 5-8, 17. Dr. Mitcheff denied the request, concluding that Mr. Patterson did not appear to have an airway obstruction. Dkt. 70-4 ¶ 7. Dr. Byrd again submitted a FER on March 3, 2021, for Mr. Patterson to receive an Alvesco inhaler. Dkt. 70-1 at 16. Dr. Mitcheff denied this request, but concluded that Singulair could be tried, if Dr. Byrd believed there was a significant allergic component to Mr. Patterson's asthma. *Id.* In his email responding to the request for Alvesco, Dr. Mitcheff stated: "We have to stop all this convenience stuff! When your patients transfer, I get complaints." Dkt. 82 at 130. On June 15, 2021, when Dr. Byrd submitted a FER for Mr. Patterson to receive Singulair, Dr. Mitcheff approved it. Dkt. 70-1 at 58.

18

Mr. Patterson contends that Dr. Mitcheff failed to fully consider his condition and denied FER requests to save money, while Dr. Mitcheff argues that his denial of the first two FERs was not related to the cost of prescribing the medications, but rather the clinical indication for doing so. Dkt. 70-4 ¶ 11. In short, Dr. Mitcheff argues that he merely exercised his medical judgment when denying FERs for asthma medication for Mr. Patterson. Even though Dr. Mitcheff denies deliberate indifference, "deliberate indifference must be inferred from the propriety of [his] actions." *Dean*, 18 F.4th at 241. Here, the evidence conflicts regarding whether Dr. Mitcheff exercised judgment. When he denied Dr. Byrd's first request for Singulair, he explained that the denial was because he did not see evidence of an airway obstruction, a conclusion he contends was based on medical judgment. Dkt. 70-4 ¶ 7. But he did not offer any alternative even though he was told that Mr. Patterson complained that his inhaler was not lasting him 3-4 months between refills. Dkt. 70-1 at 17.  In addition, he later did approve Singulair, based on the possibility that there was an allergic component to Mr. Patterson's condition. Dkt. 70-1 at 16. But Dr. Mitcheff provides no explanation why this allergic component was relevant to his decision on the second FER, but not the first. Further, in responding to this request, Dr. Mitcheff reprimanded Dr. Byrd in an email for requesting "convenience" medications. Dkt. 82 at 130. While Dr. Mitcheff testifies that his decisions were not based on cost, dkt. 70-4 ¶ 11, based on his lack of explanation for approving Singulair only on the second request and this email, a reasonable jury might conclude otherwise. Dr. Mitcheff therefore is not entitled to summary judgment.

### D. Nursing Defendants

With the exception of Ms. Batchelor and Nurse Powers, Mr. Patterson alleges that the nursing defendants – Nurse Wolfe, Nurse Bradley, and Ms. Roberts – failed to adequately address his written requests.

### 1. Ms. Batchelor

Ms. Batchelor interacted with Mr. Patterson once regarding his GERD. He saw her on September 26, 2020, when she told him that he did not have any refills left on his Carafate prescription and would need to be seen by a provider to have that prescription renewed. Dkt. 70-8 ¶ 7. But Ms. Batchelor is not a doctor and cannot order medication. *Id.* ¶ 6. Further, according to his medical records, he should have had enough Carafate to last him until his next chronic care visit with Dr. Byrd on October 8, 2020. Dkt. 70-1 at 43-49; dkt. 70-8 ¶ 7. No reasonable jury could determine based on these facts that Ms. Batchelor was deliberately indifferent to Mr. Patterson's medical needs.

### 2. Nurse Powers

Mr. Patterson alleges that Nurse Powers was deliberately indifferent to Mr. Paterson's breathing condition. He asserts that on October 7 and 8, 2020, he informed Nurse Powers that he had been experiencing severe asthma attacks and that she told him she would retrieve a rescue inhaler from the pharmacy. Dkt. 70-9 ¶ 5. Nurse Powers does not recall these encounters but testifies that she would not have told Mr. Patterson that she would retrieve an inhaler from the pharmacy because she is not allowed to order medical treatment or prescribe medication. *Id.* ¶ 6-7.

Even if a reasonable jury believed that Nurse Powers told Mr. Patterson that she would retrieve an inhaler for him, this is not enough to allow a conclusion that she was deliberately indifferent to his serious medical needs. She was not authorized to prescribe medication or order treatment, so she could not have obtained an inhaler. Dkt. 70-9 at ¶ 7. Further, the record reflects that there was a process to request medication refills and that Mr. Patterson saw Dr. Byrd, who did have the authority to prescribe medication, shortly after he alleges he spoke to Nurse Powers. Dkt.

70-1 at 43-47. No reasonable jury could conclude based on these facts that Nurse Powers was deliberately indifferent to Mr. Patterson's asthma.

### 3. Nurses Wolfe, Bradley, and CNA Roberts

Nurses Wolfe, Bradley, and Hobson, and CNA Roberts each responded to written requests from Mr. Patterson, largely requesting medication refills. Many of those requests simply listed the medications that Mr. Patterson wanted refilled. *See* dkt. 70-1 at 31, 35, 38, 39, 40, 68, 69.

Nurse Wolfe responded to several such requests and ordered refills that were available. *See* dkt. 70-5 ¶ 10 (sent for available requested refills); dkt. 70-1 at 35 (did not address inhaler because a refill was not available); 61 (noting that he had just become eligible for an inhaler refill and ordering it); 67 (sent for refills); 68 (sent for refills); dkt. 70-5 ¶ 11 (did not address the inhaler request because Mr. Patterson was not due for a refill yet); ¶ 12 (renewing artificial tears but noting that he did not have a refill of Tobrex). While Mr. Patterson did request to see the doctor or did describe his medical complaints in some of the requests Nurse Wolfe responded to, it is undisputed that at the time he was receiving treatment from the doctor. Indeed, while Nurse Wolfe testifies that she did not schedule appointments, on January 27, 2021, Mr. Patterson asked to be scheduled to see the doctor and saw the doctor just two days later. Dkt. 70-1 at 34.

CNA Roberts also responded to some of Mr. Patterson's requests, also providing those refills that were available. Dkt. 70-7 ¶ 7; dkt. 70-1 at 62.

Similarly, Nurse Bradley provided available refills upon Mr. Patterson's requests, sometimes before a refill was technically available. Dkt. 70-1 at 38 (refill not available at this time); dkt. 70-1 at 41 (explaining that he was not yet due for a refill, but that one was ordered that day); dkt. 70-1 at 40; dkt. 70-6 ¶ 7 (did not address the inhaler because it has just been addressed in a recent HCRF); dkt. 2-1 at 22 (noting that he was not due for a refill, but asked for a refill);

dkt. 70-1 at 33 (noting that he was not yet due for a refill). Indeed, on occasion she requested a refill when one was not yet available. Dkt. 70-6 ¶ 8.

None of these defendants had the authority to diagnose Mr. Patterson, order treatment, or prescribe medications. Dkt. 70-5 ¶ 9; dkt. 70-9 ¶ 7; dkt. 70-6 ¶ 11; Dkt. 70-7 ¶ 6; dkt. 70-8 ¶ 6. As nurses, they were entitled to rely on the doctor's treatment decisions. *See Reck v. Wexford Health Sources, Inc*., 27 4th 473, 485 (7th Cir. 2022). Nonetheless, "[n]urses, like physicians, may [] be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (citation omitted). Thus, "a nurse confronted with an 'inappropriate or questionable practice' should not simply defer to that practice, but rather has a professional obligation to the patient to 'take appropriate action,' whether by discussing the nurse's concerns with the treating physician or by contacting a responsible administrator or higher authority." *Id.*  But Mr. Patterson has not presented evidence that would allow a jury to conclude that any of these defendants disregarded a risk to his health or was confronted with an inappropriate practice by the doctors. None of these defendants interacted personally with Mr. Patterson. And many of his HCRFs simply listed the medications for which he was seeking a refill. Nothing in those forms informed to these defendants that Mr. Patterson was not receiving treatment or that the doctor was disregarding his conditions. Further, while he did at times describe his condition in those forms, he often asked to see the doctor and was already scheduled or had recently seen the doctor. On these facts, no reasonable jury could conclude that any of these defendants was deliberately indifferent to Mr. Patterson's medical needs.

### 4. Nurse Hobson

Nurse Hobson responded only to Mr. Patterson's grievance in which he complained of a delay in receiving Singulair for his asthma. Dkt. 70-11 (Grievance Records). By the time he had

submitted the grievance, Mr. Patterson had received the medication in question. *Id.* Because Mr. Patterson had already received his medication, no reasonable jury could conclude that Nurse Hobson was deliberately indifferent to Mr. Patterson's medical needs.

### E. Wexford

Finally, Mr. Patterson contends that all of the alleged denials of treatment resulted from a policy, practice, or custom by Wexford.

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983 and can be sued when their actions violate the Constitution. *Dean v. Wexford Health Sources, Inc*., 18 F.4th 214, 235 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978)). To state a *Monell* claim, Mr. Patterson must identify an action taken by the municipality and allege a causal link between the municipality's action and the deprivation of federal rights. *Dean,* 18 F.4th at 235. "A municipality 'acts' through its written policies, widespread practices or customs, and the acts of a final decisionmaker." *Levy v. Marion Co. Sheriff*, 940 F.3d 1002, 1010 (7th Cir. 2019). Next, he must show that the municipal action amounts to deliberate indifference. *Dean*, 18 F.4th at 235. "If a municipality's action is not facially unconstitutional, the plaintiff 'must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences.'" *Id.* "[C]onsiderably more proof than the single incident will be necessary in every case* to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation." *Id.* (cleaned up) (emphasis in *Dean*). Finally, the plaintiff must show a direct causal link between the municipality's action and the deprivation of federal rights. *Id*.

In response to the motion for summary judgment, Mr. Patterson argues that Wexford has a systemic practice of instituting barriers to medical care, of delaying physician visits, and of failing to provide medication refills. He contends that Wexford's policy requiring him to request refills, instead of allowing automatic refills, resulted in at least some of the delays in receiving his medications. Dkt. 81 at 42. Mr. Patterson appears to suggest that, under Wexford policy, he could not request a medication until the day it was due and that his refill requests took two days to be completed. Dkt. 82 at 170. But Mr. Patterson does not point to a Wexford requirement that he could request a refill only on the day it was due. Indeed, at least some of Mr. Patterson's HCRFs indicate that he requested refills at least a day before they were due. *See* dkt. 70-1 at 35. Also, Mr. Patterson would sometimes receive refills before they were due. *See, e.g.*, dkt. 70-6 ¶ 8-9; dkt. Dkt. 70-1 at 66; dkt. 70-5 ¶ 10 (receiving Carafate on September 25 when he should have had enough until October). Further, while Mr. Patterson relies largely on his own experiences to support his arguments, more proof is required to show a causal connection between a policy and a constitutional deprivation. *Dean* 18 F.4th at 235.

Mr. Patterson also suggests that either Dr. Byrd, as the site medical director, Dr. Mitcheff, as the RMD, Amy Wright as the Director of Nursing, or Kim Hobson as the HSA, were final decision makers whose decisions can be treated as Wexford's decisions. But he does not cite to admissible evidence to support this conclusion. Finally, he contends that some of the nursing defendants were incompetent or poorly trained and that this reflects a policy of deliberate indifference on Wexford's part. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), as amended (Aug. 25, 2016) (negligence is not enough to show deliberate indifference).

But, as discussed above, there is no evidence that the nursing defendants failed to respond properly to Mr. Patterson's requests.

Mr. Patterson has not pointed to evidence to support a conclusion that any of the constitutional violations he alleges resulted from a policy, practice, or custom on Wexford's part and Wexford is therefore entitled to summary judgment.

## IV.
## Conclusion

The defendants' motion for summary judgment, dkt. [68] is granted in part and denied in part. The motion is **GRANTED** as to Mr. Patterson's claims against Wexford, Ms. Hobson, Ms. Wolfe, Ms. Roberts, Ms. Batchelor, and Ms. Auler (Bradley). The **clerk shall terminate** these defendants on the docket.

The motion is also **GRANTED** as to Mr. Patterson's claims that Dr. Byrd, Dr. Rajoli, and Dr. Mitcheff exhibited deliberate indifference to his need for GERD treatment. These claims are dismissed.

The motion is **DENIED** as to Mr. Patterson's claims that Drs. Byrd, Rajoli, and Mitcheff were deliberately indifferent to his need for treatment of his lung conditions. These claims shall proceed to a settlement conference or trial if one is necessary. The **clerk shall include** a form motion for assistance with recruiting counsel with Mr. Patterson's copy of this Order. If Mr. Patterson wishes to ask the Court to recruit counsel to represent him, he should fill out this form and return it by March 31, 2024.

**IT IS SO ORDERED.**

Date:  3/8/2024

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

DEAUNDRA PATTERSON
197951
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com